IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 23 CR 323 |
| v. | ) | |
| | ) | Honorable Elaine E. Bucklo |
| NIKKO D'AMBROSIO, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S RESPONSE TO GOVERNMENT'S MOTIONS IN LIMINE

Defendant, **NIKKO D'AMBROSIO**, by and through his attorneys, **RALPH E. MECZYK** and **CHRISTOPHER T. GROHMAN**, respectfully submits the following response to the government's motions in limine. In support, Mr. D'Ambrosio, through counsel, states as follows:

### I. The Emails Between Defendant D'Ambrosio and Nick Dacanay Are Highly Relevant to the Defense and Admissible

It is the theory of the defense that Defendant D'Ambrosio did not do his own taxes. Instead, he asked his third cousin, Nick Dacanay, to do his taxes. Nick Dacanay did the taxes, including creating the fake deductions at issue in this case. Because Dacanay was an IRS employee, he could not file the taxes directly with the IRS. So, he routed the taxes that he completed through an outside account, Sheila January-Fort to file, even though it was Dacanay who

actually filed out the majority of the tax forms. Indeed, for at least in one tax year, there is an email from January-Fort to D'Ambrosio containing only the signature page for the tax returns and not the entirety of the tax forms.

The emails between D'Ambrosio show exactly this – communications between D'Ambrosio and Dacanay where D'Ambrosio asks Dacanay to do his taxes; Dacanay agrees, there is some back and forth about how to complete the tax returns, and the Dacanay liaises between D'Ambrosio and January-Fort. D'Ambrosio then pays Dacanay $150 per year for the work performed.

The government argues that these emails are irrelevant because "All of the underlying information in the worksheets – i.e., the false business meal expense, mileage, and charitable contribution information – came from defendant." That's the government's theory. The defense theory is the opposite and it is for the jury to decide the facts. The government has failed to show a single email or text message where D'Ambrosio gives any fake information to Dacanay, leaving open the defense argument that Dacanay was the one who came up with the fake numbers. Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense." *Crane v. Kentucky,* 476 U.S. 683, 689–690 (1986) quoting *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). Here,

exclusion of crucial evidence relating to Mr. D'Ambrosio's defense would undermine this principle and almost certainly result in a new trial being ordered on appeal. *See Holmes v. South Carolina*, 547 U.S. 322 (2006); *Harris v. Thompson*, 698 F.3d 609, 612 (7th Cir. 2012). The relevant emails are listed on the previously submitted exhibit list and are contained as part of Exhibit A, attached hereto.

Likewise, there is no hearsay problem with these emails. First, none of these emails are being introduced for the truth of the statements in the emails, but rather to show the state of minds of the people speaking. Further, emails that are contemporaneous recordings of the speaker's thoughts easily satisfy the residual exception because even the government does not argue that these emails contain lies. *Brokaw v. Boeing*, 137 F.Supp.3d 1082 (N.D. Illinois 2015). Defendant anticipates calling Dacanay as a witness and the government is free to inquire about these emails on cross-examination.

## II. D'Ambrosio Will Not Introduce the Amended Tax Returns Unless the Government Opens the Door

D'Ambrosio does not intend to introduce the amended tax returns in his case-in-chief. That said, it would be possible for the government to open the door to their introduction. For example, were the government to cross-examine a witness about D'Ambrosio's failure to take ameliorative action after learning

that the tax returns were incorrect, it would become relevant that he filed correct amended returns.

### III. The Testimony of Both Ron Braver and Dr. Farmilant Are Highly Relevant and Admissible

The government must prove that Defendant acted willfully in filing his false returns. Defendant will argue that he did not supply the fake deductions and did not notice the fake deductions and/or did not appreciate that they were clearly fake before signing them.

The government will likely argue that Defendant's failure to notice how egregious these deductions were is unbelievable. As such, the fact that neither Dacanay nor Sheila January-Fort noticed that these deductions were way out of line is highly relevant to rebut this potential argument from the government. Likewise, the requirement that tax preparers conduct due diligence and examine the returns for any potential malfeasance is likewise relevant. If paid professionals did not think these tax returns were out of line, why should the Defendant have immediately caught any mistakes on tax returns that he did not personally complete?

As showed in the expert report submitted under seal, Dr. Farmilant ran a variety of cognitive tests on Nikko and found him to be cognitively deficient in several areas, especially math, and his results on several of these tests are indicative of "significant frontal lobe impairment." The primary relevance of

4

this evidence would go to Defendant's argument that, unlike a normal person, if Defendant was shown these tax returns, he wouldn't immediately recognize that the deductions are not remotely plausible. Defendant will not introduce through Dr. Familant, any conversations that he had with Defendant's mother, although Defendant's mother may testify at trial to lay the foundation for Dr. Familant's opinions. In addition to Defendant's mothers' testimony, Defendant intends to introduce educational and medical records to support the foundation for Dr. Familant's testimony. Likewise, Defendant will not introduce Dr. Familant's conclusion that Defendant lacked the capacity to act willfully. Rather, he will simply tell the jury about the results of the tests, tell the jury that the results of these tests show low-IQ and cognitive impairment, and then opine that a person with such impairments would not necessarily immediately recognize that tax returns contained egregious errors. As shown in the expert report, these tests are generally accepted in the field to test for cognitive impairment. The government takes umbrage that there is no "data" supplied, but there is no requirement to supply each and every answer to each question asked as part of these tests. The government can inquire about them on cross examination and has had the ability to hire their own expert if they wanted.

5

December 28, 2023                                        Respectfully submitted,

By: */s/ Christopher T. Grohman*
CHRISTOPHER T. GROHMAN
Benesch Friedlander Coplan and Aronoff
71 S. Wacker Dr. Suite 1600
Chicago, Illinois 60601
Phone: (312) 212-4943
Email: cgrohman@beneschlaw.com

RALPH MECZYK
*Attorneys for Nikko D'Ambrosio*