UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>NIKKO D'AMBROSIO | No. 23 CR 323<br><br>Judge Thomas M. Durkin |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR
JUDGMENT OF ACQUITTAL OR NEW TRIAL**

The UNITED STATES OF AMERICA, by its attorney, MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, submits the following response to defendant Nikko D'Ambrosio's Motion for Judgment of Acquittal or New Trial, (R. 69), and respectfully requests that the Court deny defendant's motion.

**I.      PROCEDURAL POSTURE**

The indictment charged defendant Nikko D'Ambrosio with two counts of false statements in tax filings, in violation of Title 26, United States Code, Section 7206(1). R. 1. A jury trial began on January 16, 2024. R. 61, 62. Following the close of the government's case-in-chief, defendant moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29(a), which the Court denied. On January 19, 2024, the jury returned a verdict of guilty on both counts. R. 66, 67. On February 29, 2024, defendant filed the present motion for judgment of acquittal, under Federal Rule of Criminal Procedure Rule 29(c), or for a new trial, under Federal Rule of Criminal Procedure 33(a). R. 69.

## II. TRIAL TESTIMONY AND EVIDENCE

Investigation Background

IRS Special Agent Christopher Suba testified at trial regarding the background of the investigation, including the sweepstakes industry and defendant's receipt of Form 1099s from a sweepstakes company Mac-T LLC ("Mac-T"). By way of stipulation and Agent Suba's testimony, the government introduced and published defendant's individual income tax returns for tax years 2019 and 2020, along with IRS Forms 8879 (IRS e-file Signature Authorization) for the 2019 and 2020 returns, which defendant signed under penalty of perjury indicating that he had examined his individual income tax returns and accompanying schedules and statements, and, to the best of his knowledge, they were true, correct, and complete.

Defendant's 2019 Individual Income Tax Return

As the government presented to the jury, for the 2019 tax year, defendant reported $213,185 in gross income, which was reduced by, among other things, the following claimed business expenses and tax deductions:

- A $32,094 deduction based on a claimed $64,189 spent on eligible business meal expenses;

- A $122,169 deduction based on claimed business car and truck expenses arising from 210,637 business miles driven; and

- A $26,751 deduction based on $29,775 in claimed 2019 charitable contributions to St. John Cantius Church. This amount of charitable contributions permitted defendant to claim a tax deduction of $26,751. The limitation to the amount that could be claimed was notated in Box

14 of defendant's Schedule A, with the note "CONTRIBUTIONS LIMITED DUE TO AGI [adjusted gross income]."

These claimed deductions combined to permit defendant to reduce his 2019 taxable income by approximately $181,014. After claiming the above deductions, along with others, defendant reported a 2019 net taxable income of $4,443—approximately $208,742 less than his reported gross income.

Defendant's 2020 Individual Income Tax Return

The government also published defendant's 2020 tax return. For the 2020 tax year, defendant claimed $334,210 in gross income and claimed similar expenses and deductions, though in greater amounts. These included:

- A $99,806 deduction based on a claimed $199,612 spent on eligible business meal expenses;

- A $152,170 car and truck expense deduction based on a claimed 264,673 business miles driven; and

- A $37,749 deduction based on $34,725 in claimed 2020 charitable contributions to St. John Cantius Church, plus $3,024 in carryover contributions from the previous year.

These claimed expenses and deductions combined to permit defendant to reduce his 2020 taxable income by approximately $289,725. After claiming the above

expenses and deductions, along with others, defendant reported a 2019 net taxable income of $14,874—approximately $319,336 less than his reported gross income.

*Preparation and Filing of Defendant's Individual Income Tax Returns for Tax Years 2019 and 2020*

The government introduced testimony from defendant's cousin, Nicholas Dacanay. Dacanay testified that he was an IRS employee who, although not involved in the preparation or filing of individual income tax returns in his professional capacity, had assisted defendant with his tax returns in years past when defendant was a W-2 employee. Dacanay testified that he also assisted defendant in compiling information for the 2019 and 2020 tax returns into worksheets. The worksheets reflected that defendant purportedly drove three vehicles—a 2010 Toyota Camry, a 2013 Lexus RX350, and a 2017 Range Rover in connection with his work. Dacanay testified that defendant initially provided round numbers for the mileage figures for each vehicle, and Dacanay told defendant that the numbers had to be precise, which required defendant to review the vehicles' odometers and provide exact numbers. Dacanay further testified that defendant provided dollar amounts for his business meal expenses and charitable contributions to a Chicago catholic church. According to Dacanay, after compiling the information defendant provided in an Excel spreadsheet—which he called "worksheets"—he then connected defendant with

Sheila January-Fort, a professional tax preparer whom Dacanay also used to file his personal income tax returns.

The government introduced emails and text messages between Dacanay and defendant, which reflected communications about mileage driven using the vehicles, as well as Dacanay sending defendant multiple versions of the worksheet with the relevant numbers supporting defendant's claimed tax deductions changed in successive drafts. Dacanay testified that all the information in the worksheets came from defendant, and that the numbers changed because defendant provided Dacanay with updated information regarding mileage, business meal expenditures, and charitable contributions. Dacanay also testified that he included the charitable contributions in the worksheet at defendant's direction, and that he was otherwise unfamiliar with St. John Cantius Church. Finally, Dacanay testified that defendant told Dacanay that defendant maintained supporting records for all the claimed expenses and contributions.

January-Fort testified that she took the information that Dacanay and defendant provided to her in the worksheets and prepared defendant's individual income tax returns for 2019 and 2020. January-Fort testified that she sent draft copies of those returns to defendant for his review, and only filed the returns upon receiving a signed Form 8879 from defendant and confirmation that the tax return was accurate. Further, January-Fort testified that she recalled a specific phone conversation with defendant in 2021 (when preparing defendant's 2020 income tax

5

return), where defendant informed her that the business meal expense information was inaccurate and should be higher.

*Evidence of the Falsity of the 2019 and 2020 Tax Returns*

The government introduced a variety of records and witness testimony to establish the falsity of the 2019 and 2020 tax returns. Regarding the vehicles, the government introduced records from State Farm Insurance Company and the Illinois Secretary of State, indicating that defendant did not own or insure any of the three vehicles for which he claimed to drive in significant quantities for business purposes. The government introduced testimony from Illinois State Trooper Michael Cokins, who discussed a crash investigation involving the 2017 Range Rover. Trooper Cokins testified that, during the investigation, he interviewed defendant, who indicated that the vehicle belonged to and was driven by defendant's father. The government also introduced records from defendant's condominium building, which reflected that defendant only had a single parking space available for one vehicle.

As to the mileage figures, the government introduced records from the Illinois EPA related to vehicle emissions testing for the Lexus and Toyota, dealership/vehicle maintenance records for the Lexus, and records from Liberty Mutual Insurance related to the Range Rover, all of which reflected odometer readings for the vehicles. Through Agent Suba, the government introduced summary charts reflecting that the

6

Excel worksheets and defendant's 2019 and 2020 tax returns drastically overstated the number of miles driven for all three of the vehicles by tens of thousands of miles.

Regarding meal expenses, the government introduced bank and credit card records and records from Amazon showing defendant's purchases in 2019 and 2020. Agent Suba conducted a financial analysis, which reflected that the amount of meal expenses in the 2019 and 2020 tax returns was not possible based on defendant's credit card expenditures and cash withdrawals. Agent Suba's analysis also reflected gas expenditures that reflected the mileage figures were similarly not possible.

Finally, for the charitable contributions, the government introduced testimony from Kathleen Abel, the business manager at St. John Cantius Church, who testified that there was no record of defendant being a registered parishioner at the church in 2019 or 2020, and that there was no record of defendant making a single contribution to St. John Cantius in either year.

*Defendant's Interview with the IRS*

Agent Suba testified about his interview with defendant on January 28, 2022. According to Agent Suba, during the interview, the IRS agents asked defendant about his 2020 tax return and the above-described business expenses and deductions, and defendant claimed that they were correct. Specifically, Agent Suba testified that he showed defendant the Schedule C to the 2020 tax return, and defendant confirmed that it was accurate. Defendant further informed that, in his role with Mac-T, he

7

helped place the electronic sweepstakes kiosks into businesses, and that he "wined and dined" business owners in connection with his work.

At trial, though, Agent Suba completed a summary chart based on defendant's commissions from Mac-T. The commissions chart reflected that almost all of defendant's commissions came from gas stations and convenience stores. The government called two business owners with defendant's sweepstakes kiosks as witnesses, who each identified defendant as a sweepstakes machine salesman, and testified that defendant never took them out for any business meals and that they never received any gifts from defendant in connection with their business.

*Tax Deficiency Calculations*

The government also introduced the testimony of IRS Revenue Agent Rehman ("Ray") Shami. Revenue Agent Shami testified about certain tax principles – including filing requirements and appropriate expense and contribution deductions – and then compiled charts regarding the tax deficiency for the 2019 and 2020 tax years. In total, Agent Shami opined that, in 2019, the total tax due and owing was $36,625, and in 2020, the total tax due and owing was $82,573.

*Defense Evidence*

Defendant testified during the defense case. Defendant acknowledged that the 2019 and 2020 tax returns were false, in that the mileage figures, meal expenses, and charitable contributions were all incorrect. Defendant claimed that he relied entirely on Dacanay for the worksheets and that he had never reviewed them. Defendant contended that Dacanay falsified the information in the worksheets on his own, and

8

that defendant did not realize that Dacanay had put false information in the worksheets. Defendant further testified that he did not review the draft returns that January-Fort sent to him and did not read the Form 8879s before he signed them under penalty of perjury. Defendant also testified that, in total, between 2019 and 2020, he paid approximately $130 for one business meal. Defendant said that he paid Dacanay approximately $200 for Dacanay's assistance with defendant's tax returns, and that he had done so each year going back to when he was a W-2 employee.

Dr. Steven Farmilant also testified during the defense case. Dr. Farmilant reviewed certain medical records from defendant's childhood, as well as educational records, and interviewed defendant on two occasions. Based on those records and information provided by defendant, Dr. Farmilant concluded that defendant had a cognitive impairment. Dr. Farmilant testified that individuals with such a cognitive impairment may not appreciate numerical information if it were put before them. Dr. Farmilant acknowledged that defendant's purported cognitive impairment did not cause him to or preclude him from lying, including on tax filings.

*Amended Tax Returns*

After defendant's testimony, the government presented a rebuttal case, introducing defendant's amended tax returns filed by another tax preparer at defendant's direction in 2022 (after defendant's interview with Agent Suba and awareness that the IRS was investigating the accuracy of his original 2019 and 2020 tax returns). The amended tax returns for 2019 and 2020 similarly reflected significant claimed business mileagle (122,169 miles in 2019 and 152,170 miles in

9

2020), business meal expenses in ($23,100 in 2019 and $21,562 in 2020),[1] and charitable contributions for 2019 ($2,600) and 2020 ($5,200). The amended returns included a submission by defendant's new tax preparer indicating that he received a "limited amount of documentation" from defendant and relied on "verbal evidence provided by" defendant. None of the figures in the amended 2019 and 2020 tax returns were supported by the evidence, but, more importantly, they contradicted defendant's sworn testimony that he had one business meal in 2019 and 2020, which meal cost $150.

*Jury Verdict*

Following instructions from the Court and argument by the parties, the jury returned a verdict of guilty on both counts of the indictment.

## III. LEGAL STANDARDS

### A. Legal Standard for Judgment of Acquittal under Rule 29(c)

Federal Rule of Criminal Procedure Rule 29(c) states:

> [a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later . . . . If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal.

When considering a motion for judgment of acquittal:

> [Courts] ask whether at the time of the motion there was relevant evidence from which the jury could reasonably find the defendant guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the

---

[1] The business meal expenses in the Schedule Cs were 50% of the total expenses defendant represented that he incurred in 2019 and 2020. Thus, by claiming meal expenses of $23,100 in 2019 and $21,562 in 2020, defendant was representing to the IRS that he actually incurred meal expenses of $46,200 in 2019 and $43,124 in 2020.

> Government. We must bear in mind that it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences.

*United States v. Wilson*, 879 F.3d 795, 802 (7th Cir. 2018) (internal citations and punctuation omitted). "[T]he reviewing court must use its experience with people and events in weighing the chances that the evidence correctly points to guilt against the possibility of innocent or ambiguous inference." *Id*. The court "must not rend the fabric of evidence and examine each shred in isolation." *Id*. (internal citation and quotation marks omitted); *see also United States v. Wojtas*, No. 15 CR 399, 2018 WL 8804148, at *5 (N.D. Ill. June 25, 2018) ("In a circumstantial case like this one, each piece of evidence is not viewed in isolation, and drawing inferences from the collective weight of the evidence is not improper.").

The standard is "demanding for criminal defendants . . . and [the court] will reverse only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Maez*, 960 F.3d 949, 966 (7th Cir. 2020) (internal citations and quotation marks omitted). "Appellants raising insufficiency challenges face a nearly insurmountable hurtle." *United States v. Johnson*, 874 F.3d 990, 998 (7th Cir. 2017) (internal citation and quotation marks omitted). "Reversal under this standard is rare because we defer heavily to the jury's findings and review evidence in the light most favorable to the government." *Id*.

**B.     Legal Standard for Motion for New Trial Under Rule 33**

Rule 33(a) of the Federal Rules of Criminal Procedure states, "[u]pon the

11

defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Courts have interpreted Rule 33 to require a new trial in the interests of justice in "a variety of situations" in which the "substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Eberhart*, 388 F.3d 1043, 1048 (7th Cir. 2004), *overruled on other grounds*, 546 U.S. 12 (2005) (citation omitted).

"[A] Rule 33 motion is not to be granted lightly," as it requires overturning a jury's verdict. *Eberhart*, 388 F.3d at 1048 (citation and internal quotation marks omitted). The Court should grant a motion for a new trial only if the evidence "preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *United States v. Swan*, 486 F.3d 260, 266 (7th Cir. 2007) (internal citation omitted)

## IV. ARGUMENT

### A. The Evidence Presented at Trial Was Sufficient to Sustain a Conviction on Each Count

Counts One and Two of the indictment charged defendant with making false statements in corporate and personal tax returns. R. 1. To establish that defendant was guilty of making false statements in tax returns beyond a reasonable doubt, the government was required to show that: (1) the defendant prepared an income tax return or caused someone to prepare an income tax return; (2) the income tax return was false as to a material matter, as charged in the Count; (3) the defendant signed the income tax return, which contained a written declaration that it was made under penalties of perjury; (4) the defendant acted willfully, that is, he knew that he had a

12

legal duty to file a truthful tax return, but when he signed the return, he did not believe that it was truthful as to a material matter; and (5) the defendant filed the income tax return with the Internal Revenue Service. *United States v. Pree*, 408 F.3d 855, 857 (7th Cir. 2005).

Defendant did not, and does not, contend that the government failed to satisfy its burden with regard to the first, second, third, or fifth elements. Instead, defendant argues that the evidence did not prove, beyond a reasonable doubt, defendant's knowledge of the falsity of returns. R. 69 at 3-4. As set forth below, though, the government introduced overwhelming evidence that defendant acted willfully in connection with the filing of the false returns.

### 1. The Evidence Demonstrated That Defendant Willfully Cause the Filing of the Charged Tax Returns.

The government's evidence established that defendant acted willfully when he caused the filing of the 2019 and 2020 tax returns. That is, the evidence established that defendant knew that he had a legal duty to file a truthful tax return, but when he caused each tax return to be filed, he did not believe that the return was truthful as to a material matter.

The government's evidence established that defendant worked with Dacanay to prepare the worksheets, which were sent to January-Fort as part of the preparation of the 2019 and 2020 tax returns. The Forms 8879, which defendant

signed under penalty of perjury, reflected that defendant represented that he had read the returns and affirmed that the returns were true, correct, and complete.

Dacanay testified that the underlying information in the Excel worksheets – which was demonstrably false – came from defendant, and that defendant represented to him that he maintained supporting records for that information (including the mileage, meal expenses, and charitable contributions). The email and text exchanges that the government introduced into evidence further corroborated Dacanay. One text exchange reflected discussion of defendant providing mileage information. The email exchanges reflected that the numbers in the worksheet changed, indicating that defendant had provided new information to Dacanay as part of the process. January-Fort testified that she sent draft tax returns for 2019 and 2020 to defendant (not Dacanay) for defendant's review. Email correspondence corroborated January-Fort's account. Further, January-Fort testified that defendant contacted her in 2021 about the 2020 tax return and drew her attention to the business meal expense on the Schedule C and told her that the information was incorrect (and that the number should be higher). That testimony reflects that defendant reviewed the draft 2020 tax return, intentionally requested that January-Fort include false information therein, and that defendant knew the information was false.

Defendant contends that the evidence of defendant's knowledge was "equally balanced." R. 69 at 4. Other than defendant's speculation that Dacanay was an equal participant in any scheme to defraud the IRS, defendant fails to offer any evidence

14

rebutting the evidence set forth above. To the extent defendant would seek to highlight his own testimony (and he does not do so in his motion), the jury was entitled to, and necessarily did, reject that testimony as false. Defendant's testimony – that he had not reviewed anything, fully entrusted the process to Dacanay, and that Dacanay had falsified defendant's tax returns for defendant's financial benefit and with no personal benefit – was both contradicted by the record evidence and facially absurd. The jury was entitled to reject it, and did.

Ignoring all the other evidence introduced by the government, defendant brands Dacanay's testimony as "implausible." R. 69 at 4. But once the jury has heard the evidence, reviewed the facts, and reached its verdict, it is not for this Court to make retroactive credibility assessments. *See United States v. Smallwood*, 188 F.3d 905, 913-14 (7th Cir. 1999) (court defers to the jury's credibility determinations without making its own); *see also United States v. Reed*, 875 F.2d 107, 111 (1989) (in reviewing a Rule 29 motion the judge must respect "the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences"). The jury heard both Dacanay's testimony and defendant's testimony, along with all of the other evidence, and returned a guilty verdict. There is simply no reason to view the evidence, as defendant suggests, as "equally plausible" and disturb the jury's verdict.

Defendant cites to *United States v. Harris*, 942 F.2d 1125 (7th Cir. 1991), where the Seventh Circuit reversed a conviction on tax charges. R. 69 at 3-4. But *Harris* is easily distinguishable. In *Harris*, a jury convicted twin sisters of tax evasion after

15

they each received over $500,000 from a donor. *Harris*, 942 F.2d at 1127. The court found that the government's evidence failed to prove the donor's intent—critical to determining whether the money provided was meant to be a gift (for which the donor would have to pay a tax) or a distribution (which would have been income to the twin sisters). *Id.* at 1129-30. That factual and evidentiary deficiency meant that the government had failed to sustain its burden of proof. *Id.* at 1130.

But this case bears no resemblance to *Harris*. In defendant's case, the issue was defendant's knowledge of the falsity of the returns, not a third party's intent. Regarding defendant's knowledge, the government introduced ample evidence, including his correspondence with Dacanay, the Forms 8879, the returns themselves, evidence from January-Fort, defendant's interview with Agent Suba, and the amended returns. This is not a case where the government attempted to "pile [] inference upon inference." *Harris*, 942 F.2d at 1129. To the contrary, it is a case where the government introduced overwhelming evidence of defendant's knowledge that the returns that he caused to be filed were false as to a material matter.

Defendant argues that if the jury convicted defendant believing that Dacanay and defendant worked together to falsify the tax returns, the conviction should be overturned, or that he should be granted a new trial. R. 69 at 4-5. Defendant is wrong for two reasons. First, there is no reason to believe that the jury rejected Dacanay's testimony and credited defendant's testimony. To the contrary, the jury's guilty verdict reflects the opposite. Second, even if the jury believed that defendant committed tax fraud with the knowing assistance of Dacanay, that would not

16

invalidate the verdict. Even if that were the case, the government would still have satisfied its burden with regard to each element of the offense. That is, even if the jury believed that Dacanay, a multi-decade professional at the IRS aided and abetted defendant's tax fraud (without any personal financial benefit), the jury could properly convict defendant because the elements of the offense would still have been satisfied.

The cases cited by defendant are inapposite. For example, in *McCormick v. United States*, 500 U.S. 257 (1991), the Supreme Court reversed the judgment of the Fourth Circuit where it found that the Fourth Circuit affirmed a conviction "on legal and factual grounds that were never submitted to the jury," failed to address challenged jury instructions distinguishing between campaign contributions and illegal extortion payments, and pronounced a new rule for determining when payments were made under color of official right, without the issue of intent having been determined by the jury. *Id.* at 269. Defendant does not challenge the instructions provided by the Court—nor could he, the instructions were unopposed. Instead, defendant cherry-picks language from *McCormick* that does not apply here.

In sum, the evidence was more than sufficient to sustain the jury's verdict. Moreover, in light of the legal standard, which requires that the Court view the evidence "in the light most favorable to the government," "drawing all reasonable inferences in the government's favor," and with the understanding that credibility is the "exclusive function" of the jury, there is no basis to disturb the jury's verdict.

**B. Defendant Fails to Identify Any Errors Warranting a New Trial**

Defendant argues that, in the alternative, the Court should grant him a new trial under Federal Rule of Criminal Procedure 33(a). But defendant's argument is

wholly undeveloped, and undeveloped arguments should be rejected. *See United States v. King*, No. 06 CR 50074-2, 2008 WL 11516211, at *3 (N.D. Ill. Aug. 4, 2008) (rejecting post-trial Rule 29 motion regarding due process violation). Even as arguendo, defendant does not highlight a single purported error that occurred before or during trial that could or would warrant a new trial, including in the Court's ruling on pretrial motions, jury selection, evidentiary rulings, instructions given or not given, or witness testimony issues.

Accordingly, the Court should deny defendant's motion for a new trial under Federal Rule of Criminal Procedure 33(a).

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny defendant's motion.

Dated: March 15, 2024　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　MORRIS PASQUAL
　　　　　　　　　　　　　　　　　　　　Acting United States Attorney

　　　　　　　　　　　　　　　　By:　*/s/ Richard M. Rothblatt*
　　　　　　　　　　　　　　　　　　　　RICHARD M. ROTHBLATT
　　　　　　　　　　　　　　　　　　　　Assistant United States Attorney
　　　　　　　　　　　　　　　　　　　　219 South Dearborn Street, 5th Floor
　　　　　　　　　　　　　　　　　　　　Chicago, Illinois 60604
　　　　　　　　　　　　　　　　　　　　(312) 353-5300